IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BONITA VARLEY,                          )
                  Plaintiff,         )
                            )
           vs                       )  Civil Action No. 06-631
                            )
HIGHLANDS SCHOOL DISTRICT,              )
                  Defendant.         )

REPORT AND RECOMMENDATION

I. Recommendation:

        It is respectfully recommended that the defendant's motion for summary judgment (Document No. 23) be granted as to Count I of the complaint and denied as to Count II.

II. Report:

        Presently before the Court is a motion for summary judgment submitted by the defendant, Highlands School District ("Highlands").  For reasons discussed below, Highlands' motion for summary judgment should be granted in part and denied in part.

        The plaintiff, Bonita Varley, employed by Highlands as a transitions coordinator, commenced this action, alleging that Highlands discriminated against her on the basis of a perceived disability in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq.  The plaintiff complains that in January 2004, Highlands prohibited her from returning to work after she became tearful in school, and it made inquiries into her past medical history and sought to subpoena her complete medical and psychiatric records.  The Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331.

The record shows that the plaintiff began working for Highlands in 1991 as a special education teacher. In 2003, she became a transition coordinator, which entailed working with special education students, assessing their vocational skill and helping them transition into the workplace. As a transition coordinator, the plaintiff worked with parents, staff members and community members. During all relevant time periods, the plaintiff received satisfactory job performance ratings, which was the highest rank on Highlands' evaluations form.[1]

In October 2003, the plaintiff had a flashback in the presence of students. Also in October 2003, Highlands personnel, including Director of Special Education Debra Lehew, Guidance Counselor Beth Carrarini, and teacher Mindy Eckenrod, witnessed an episode in which the plaintiff rocked back and forth, tightly wrapped in a sweater and was unresponsive. The plaintiff also discussed suicide plans with Ms. Lehew and Ms. Carrarini, and in October 2003, the plaintiff showed them cuts she had made on her stomach.[2]

On January 21, 2004, the plaintiff's medication was increased. On January 21 and 22, 2004, the plaintiff became tearful at a conference located off of Highlands' premises. Believing the tearful episodes were caused by her increased medication, the plaintiff returned to work on January 23, 2004, at which time she began to cry while meeting with co-worker Brigette Huffman before the students arrived. Prior to the start of classes that day, the plaintiff went to Principal Tom Shirey and told him she could not stop crying and would not be able to work that day, and she asked to go home. The plaintiff also told Ms. Lehew that she could not finish the

---

1.    See, defendant's statement of facts at ¶¶ 1-3, plaintiff's response thereto, and plaintiff's supplemental statement of facts at ¶ 73 and defendant's response thereto.

2.    See, defendant's statement of facts at ¶¶ 4-6, 9-10 and plaintiff's response thereto.

day and needed to go home.[3]

Later that day on January 23, 2004, Principal Shirey asked Dr. Karen King to speak with the plaintiff at school.  Dr. King has a doctorate degree in psychology, is Director of Pupil Services at Highlands and functions as the school psychologist.  When Dr. King met with Principal Shirey, he told her that he was "going to 302" the plaintiff, which is an involuntary psychiatric commitment.  After speaking with the plaintiff, Dr. King informed her that she did not think a "302" was reasonable, as the plaintiff did not appear to be a danger to herself or others, and she was lucid.[4]

Dr. King and Ms. Lehew suggested that the plaintiff go to a hospital for an evaluation, which the plaintiff agreed to do.  At the hospital, the plaintiff told Dr. King she was undergoing therapy sessions on Tuesday nights.  After the plaintiff was examined, a nurse stated that her blood work indicated that her medication levels were appropriate.  The plaintiff was released from the hospital without restrictions and was found not to be a threat to herself or others; she was directed to follow up with her therapist.[5]

When Superintendent Randall Kahler was apprised of the events of January 21-23, 2004, he had Ms. Lehew tell the plaintiff that she should not report to work until she met with the school administration.  That meeting occurred on January 28, 2004, at which time Mr.

---

3.    See, defendant's statement of facts at ¶¶ 13, 23, 26, 29, plaintiff's response thereto, and plaintiff's supplemental statement of facts at ¶¶ 74-77 and defendant's response thereto.

4.    See, plaintiff's supplemental statement of facts at ¶¶ 79-82 and defendant's response thereto.

5.    See, defendant's statement of facts at ¶¶ 31-32, 34-35, plaintiff's response thereto, and plaintiff's supplemental statement of facts at ¶ 88 and defendant's response thereto.

Kahler told the plaintiff that she had to be evaluated by the District's psychiatrist before returning to school due to his concerns about her working with students.  The plaintiff agreed to undergo an evaluation by Highlands' selected doctor.  Immediately after the meeting on January 28, 2004, Mr. Kahler placed the plaintiff on paid leave with full benefits.[6]

Highlands contracted with Dr. Lawson Bernstein to evaluate the plaintiff and make a recommendation as to her ability to return to work.  On February 20, 2004, the plaintiff was examined by Dr. Bernstein.  In connection with said examination, and by letter dated February 24, 2004, Dr. Bernstein requested certain medical records from the plaintiff, including her complete psychiatric records.  Thereafter, on at least four occasions, Dr. Bernstein reiterated his request that the plaintiff provide him with copies of certain medical records and psychiatric records so he could complete his report.  However, the plaintiff did not want to relinquish all of the records requested by Dr. Bernstein, as they contained personal and confidential information, including prior abuse, which she felt were not relevant to the events of January 2004.  Instead, the plaintiff provided Dr. Bernstein with copies of medical reports related to her hospital visit in January 2004 and other information.  Dr. Bernstein never issued a report on whether the plaintiff could or could not return to work.[7]

Effective November 22, 2004, Superintendent Kahler changed the plaintiff's status by placing her on an unpaid leave of absence.  Mr. Kahler informed the plaintiff that if she completed the psychiatric evaluation and provided the medical records requested, her

---

6.    See, defendant's statement of facts at ¶¶ 38, 41-42, 44-46 and plaintiff's response thereto.

7.    Id. at ¶¶ 47, 49-51, 54, 56-57, 59, and plaintiff's supplemental statement of facts at ¶ 109 and defendant's response thereto.

employment status would be reviewed.[8]

The plaintiff filed a grievance related to her unpaid leave of absence, in which she sought reinstatement to a full time teaching position with all benefits and salary to begin immediately.  Highlands denied the plaintiff's grievance, and it was submitted to an arbitrator.  In conjunction with the arbitration, Highlands sought to subpoena the plaintiff's medical records, but the subpoena was ultimately quashed by Judge Wettick in the Court of Common Pleas of Allegheny County PA.  Thereafter, the plaintiff's grievance was settled, and she discussed the settlement with her union attorney.  Under the settlement, Highlands agreed to reinstate the plaintiff as transition coordinator and pay certain pension contributions and medical insurance reimbursements, but back pay was not part of the settlement.  The plaintiff was reinstated with no reduction in salary or step placement.  On August 11, 2006, a Consent Award was issued in connection with the settlement of the plaintiff's grievance, but she never signed a release or waiver of any claims.[9]

In her two-count complaint, the plaintiff contends that Highlands discriminated against her in violation of the ADA, as it regarded her as having a disability and prevented her from returning to work until her grievance was settled (Count I).  The plaintiff also complains that Highlands violated the ADA by engaging in prohibited medical inquiries of her past medical history which were not related to the aforesaid events of January 2004 (Count II).

Highlands has moved for summary judgment on both of the plaintiff's claims.  In

---

8.   See, defendant's statement of facts at ¶¶ 58 and 60 and plaintiff's response thereto.

9.   Id. at ¶¶ 62-64, 66-67, 71, and plaintiff's supplemental statement of facts at ¶¶ 110-111 and defendant's response thereto.

support of its motion, Highlands advances three arguments as follows: (1) the plaintiff waived her right to assert her claims when she agreed to the settlement of her grievance; (2) it is entitled to summary judgment on Count I, as the plaintiff cannot prove a prima facie case of disability discrimination; and (3) it is entitled to summary judgment on Count II, as it properly required the plaintiff to provide her medical records in connection with her independent medical exam.

Summary judgment is appropriate if no genuine issue of material fact is in dispute, and the movant is entitled to judgment as a matter of law.  F.R.Civ.P. 56(c); <u>Biener v. Calio</u>, 361 F.3d 206, 210 (3d Cir. 2004).

With respect to Highlands' first argument above, we disagree that the plaintiff is barred from raising her claims by virtue of the settlement of her grievance.  "Employees may waive employment claims against their employers so long as the waiver is made knowingly and willfully." <u>Cuchara v. Gai-Tronics Corp.</u>, 129 Fed. Appx. 728, 730 (3d Cir. 2005), citing <u>Coventry v. U.S. Steel Corp.</u>, 856 F.2d 514, 522 (3d Cir. 1988).  To determine if there was a valid waiver of claims, we consider several factors, including "the clarity and specificity of the release language" at issue, and "whether plaintiff knew or should have known [her] rights upon execution of the release".  <u>Cuchara</u>, 129 Fed. Appx. at 731, citing <u>Cirillo v. Arco Chem. Co.</u>, 862 F.2d 448, 451 (3d Cir. 1988).  Here, significantly, the plaintiff never executed a release or waiver of any claims in the course of settling her grievance, and Highlands does not argue otherwise.

Rather, it is Highlands' position that the plaintiff waived her right to assert her ADA claims because she received the same remedy in settling her grievance that she seeks in this case.  Highlands is mistaken.  The plaintiff explains that in pursuing her ADA claims, she is not seeking relief that would duplicate any benefits she received in the settlement of her grievance.

6

Instead, the plaintiff seeks remedies not obtained in the Consent Award, such as compensation owed for lost wages due to Highlands' alleged misconduct, damages for emotional distress, and reasonable attorneys' fees.[10]  As gleaned from the record, in settling her grievance, the plaintiff did not knowingly and willingly release any claims she had against Highlands.  Thus, we cannot say as a matter of law that the plaintiff waived her right to pursue her ADA claims.

With respect to Count I of the complaint, however, where Highlands is said to have regarded the plaintiff as having a disability, summary judgment is appropriate.  The ADA prohibits an employer from "discriminat[ing] against a qualified individual with a disability ... in regard to ... the hiring, advancement, or discharge of employees, ... and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112.

In cases arising under the ADA, courts utilize the three-stage shifting burden of proof set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), that was originally developed for employment discrimination cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  See, Robinson v. Lockheed Martin Corp., 212 Fed. Appx. 121, 123 (3d Cir. 2007); Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 157-58 (3d Cir. 1995).  Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination.  See, McDonnell Douglas, 411 U.S. at 802.

To make out a prima facie case under the ADA, the plaintiff must show that: (1) she has a "disability" as defined by the ADA, (2) is a "qualified individual", and (3) has suffered an "adverse employment decision" because of her disability.  Turner v. Hershey Chocolate U.S., 440 F.3d 604, 611 (3d Cir. 2006).  The term "disability" means, with respect to an individual--

---

10.    See, plaintiff's memorandum opposing summary judgment at p. 9.

(A) a physical or mental impairment that substantially limits
one or more of the major life activities of such individual;
(B) a record of such impairment; or
(C) being regarded as having such impairment.

42 U.S.C. § 12102(2).

The plaintiff bases her claim of a disability on subsection (C) above, asserting that

Highlands regarded her as having a mental impairment.  The United States Supreme Court has

stated: "[t]here are two apparent ways in which individuals may fall within [clause (C)'s

'regarded as' definition of a disability]:

(1) a covered entity mistakenly believes that a person has
a[n] ... impairment that substantially limits one or more
major life activities, or (2) a covered entity mistakenly believes
that an actual, nonlimiting impairment substantially limits one
or more major life activities.  In both cases, it is necessary that
a covered entity entertain misperceptions about the individual –
it must believe either that one has a substantially limiting
impairment that one does not have or that one has a substantially
limiting impairment when, in fact, the impairment is not so
limiting.

Sutton v. United Airlines, 527 U.S. 471, 489 (1999).

In support of summary judgment on Count I, Highlands argues that the plaintiff

cannot show that it regarded her as having a "disability", nor demonstrate that it took any adverse

action against her based on such a perception.  We agree.

To be deemed to have a "disability" under the ADA's "regarded as" clause, a

plaintiff must demonstrate "either that: (1) despite having no impairment at all, the employer

erroneously believes that [she] has an impairment that substantially limits major life activities; or

(2) [she] has a nonlimiting impairment that the employer mistakenly believes limits major life

activities."  Tice v. Centre Area Transp. Authority, 247 F.3d 506, 514 (3d Cir. 2001), citing

8

<u>Sutton</u>, <u>supra</u>, 527 U.S. at 489.  In either case, if a plaintiff seeks to establish that the employer believed her to be substantially limited in the life activity of "working", as here, she must show that the employer "regarded her as precluded from [working] more than a particular job."  <u>Parker v. Port Authority of Allegheny County</u>, 90 Fed. Appx. 600, 603 (3d Cir. 2004), citing <u>Murphy v. United Parcel Serv., Inc.</u>, 527 U.S. 516, 523 (1999).  Also see, <u>Tice</u>, <u>supra</u>, 247 F.3d at 514 (a plaintiff must be "regarded as" precluded from working "a broad class of jobs").

Here, the plaintiff has not shown that Highlands regarded her as unable to perform a broad range of jobs due to a perceived impairment.  Although Highlands did not allow the plaintiff to return to work until she underwent an independent psychiatric exam, this alone does not show it regarded her as having an impairment.  The Third Circuit Court of Appeals has explained that "'[a] covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity.'"  <u>Tice</u>, 247 F.3d at 514-15, quoting 29 C.F.R. § 1630.14(c).  "A request for such an appropriately-tailored examination only establishes that the employer harbors *doubts* (not certainties) with respect to an employee's ability to perform a *particular* job.  Doubts alone do not demonstrate that the employee was held in any particular regard ... and, as we have explained, inability to perform a particular job is not a disability within the meaning of the [ADA]."  <u>Tice</u>, 247 F.3d at 515 (italics in original).

The plaintiff insists that Highlands regarded her as having an impairment, because on January 23, 2004, Principal Shirey informed Dr. King that he was "going to 302" the plaintiff (which was an involuntary psychiatric commitment), after the plaintiff told Shirey about her tearful episodes and asked to leave school.  Dr. King did not think a "302" was reasonable for the plaintiff, but she thought it was the intention of Highland's administration to pursue a "302" for

her.  Indeed, Superintendent Kahler wrote a letter to Dr. Bernstein dated February 19, 2004, in which he stated that "[t]he initial plan had been to ask for an involuntary commitment, but Ms. Varley went to the hospital when asked to do so."[11]  Mr. Kahler testified that in light of the events of January 2004, he did not know if the plaintiff was able to perform her job; thus, he was relying on Dr. Bernstein to make a recommendation or proffer an evaluation in that regard.[12]

Dr. Bernstein's office had requested Superintendent Kahler to provide some background information on Ms. Varley prior to his evaluation.  As a result, Highlands' personnel prepared the aforesaid letter to Dr. Bernstein at the Superintendent's direction which contained information on the plaintiff's background, work history and behavior, some of which the plaintiff believes was inaccurate.[13]

Certainly, these facts confirm that Highlands harbored doubts as to whether the plaintiff could perform her duties as its transition coordinator.  However, they do not demonstrate that Highlands regarded her as having an impairment that substantially limited her ability to work.  Superintendent Kahler testified that he did not believe the plaintiff was unable to perform her job due to some sort of an impairment.[14]  Furthermore, to establish that Highlands believed her to be substantially limited in the life activity of working, the plaintiff must show that it regarded her as precluded from working a "broad class of jobs", not just a particular job.  See,

---

11.   See, tab 9 (at p. 3) to the plaintiff's appendix opposing summary judgment.

12.   See, Kahler deposition at pp. 137-138.

13.   See, plaintiff's supplemental facts at ¶¶ 91-92, defendant's response thereto, and plaintiff's memorandum opposing summary judgment at pp. 10-11.

14.   See, Kahler deposition at pp. 137-138.

Parker, supra, 90 Fed. Appx. at 603; Tice, 247 F.3d at 514.  This the plaintiff has not done.

In addition, the plaintiff has not shown that Highlands subjected her to an adverse employment action based on a perceived impairment.  The plaintiff was subjected to an adverse employment action on November 22, 2004, when Superintendent Kahler placed her on an unpaid leave of absence.  However, Mr. Kahler took that action because the plaintiff failed to provide Dr. Bernstein with the medical records he sought in order to complete the plaintiff's psychiatric evaluation.[15]  Mr. Kahler informed the plaintiff that "[s]hould you provide the information requested and complete the psychiatric evaluation, your employment status will be reviewed at that time pending the results of the psychiatric evaluation."[16]  Although Dr. Bernstein never completed his evaluation of the plaintiff, Highlands ultimately reinstated her to her position in conjunction with the settlement of her grievance.  Based on the foregoing, we find that Highlands did not institute the adverse employment action because it regarded the plaintiff as disabled; rather, it did so because she refused to provide the requested medical records to Dr. Bernstein.  Since the plaintiff has not established a prima case under the ADA, Highlands is entitled to summary judgment on Count I.

Highlands also moves for summary judgment on Count II, where the plaintiff complains that it required her to undergo medical exams and made medical inquiries of her past medical history without showing they were job-related and consistent with business necessity in violation of 42 U.S.C. § 12112(d)(4).  It is provided in 42 U.S.C. § 12112(d)(4)(A):

A covered entity shall not require a medical examination

---

15.   See, Kahler deposition exhibit 12 (at tab 5 to Highlands' appendix).

16.   Id.

and shall not make inquiries of an employee as to whether
such employee is an individual with a disability or as to the
nature or severity of the disability, unless such examination
or inquiry is shown to be job-related and consistent with
business necessity.

Highlands argues that its request that the plaintiff undergo an independent

psychiatric exam and provide related medical and psychiatric records was job-related and

consistent with business necessity.  In support of its position, Highlands cites the Equal

Employment Opportunity Commission's ("EEOC's") Enforcement Guidance on Disability-

Related Inquiries and Medical Examinations of Employees under the ADA, 2000 WL 33407181

(July 27, 2000), at Part A, question 5 which provides:

Generally, a disability-related inquiry or medical examination
may be 'job-related and consistent with business necessity'
when an employer 'has a reasonable belief, based on objective
evidence, that: (1) an employee's ability to perform essential
job functions will be impaired by a medical condition; or (2) an
employee will pose a direct threat due to a medical condition'....

Sometimes this standard may be met when an employer knows
about a particular employee's medical condition, has observed
performance problems, and reasonably can attribute the problems
to the medical condition.  An employer also may be given reliable
information by a credible third party that an employee has a medical
condition, or the employer may observe symptoms indicating that
an employee may have a medical condition that will impair his/her
ability to perform essential job functions or will pose a direct threat.
In these situations, it may be job-related and consistent with business
necessity for an employer to make disability-related inquiries or
require a medical examination...

Highlands argues that in light of the plaintiff's observed behavior on January 21-

23, 2004, it had reason to believe that the plaintiff's ability to perform the essential functions of

her job may have been impaired by a medical condition.  However, Highlands' argument is

contradicted by the record, as its Superintendent, Randall Kahler, testified that at no time did he

believe the plaintiff was unable to perform her job due to any impairment.[17]

Highlands also insists that by virtue of the plaintiff's actions, it had reason to believe that she could pose a danger to herself or its students.  If a perceived safety concern was shown in the workplace, it would suffice to establish the "business necessity" element of the ADA's standard for requiring a medical exam.  See, Ward v. Merck & Co., slip copy, 2007 WL 760391, *5 (3d Cir., Mar. 14, 2007), citing Conroy v. New York State Dept. of Corrections, 333 F.3d 88, 98 (2d Cir. 2003).  Here, however, six members of Highlands' staff, including Principal Shirey and the plaintiff's supervisor, Mrs. Lehew, testified that they never thought the plaintiff posed a threat to any students or to others.[18]  Likewise, after consulting with the plaintiff, Highlands' psychologist, Dr. King, testified that she did not believe the plaintiff was a danger to herself or to others.[19]  Based on such testimony, the plaintiff asserts that Highlands had no reasonable belief to insist that she undergo a medical exam by Dr. Bernstein and be required to relinquish all of her medical records before she could return to work.

The plaintiff also points to the EEOC's aforesaid Enforcement Guidance relating to the scope and manner of disability-related inquiries and medical examinations, which provides in pertinent part:

> An employer may require an employee to provide documentation that is sufficient to substantiate that s/he has an ADA disability..., but [it] cannot ask for unrelated documentation.  This means that, in most circumstances, an employer cannot ask for an employee's complete medical records because they are likely to contain

_____

17.   See, Kahler deposition at pp. 137-138.

18.   See, plaintiff's supplemental statement of facts at ¶ 98 and defendant's response thereto.

19.   Id. at ¶ 82.

information unrelated to the disability at issue...

2000 WL 33407181 (July 27, 2000), at Part B, question 10.  According to the plaintiff, that is

why she refused to provide all of the records sought by Dr. Bernstein, as she felt they contained

personal and confidential information that was not relevant to the events of January 2004.

In the alternative, Highlands argues that it had an absolute right to require the

plaintiff to undergo an independent medical exam pursuant to Section 1418 of the Pennsylvania

Public School Code ("School Code") which provides in relevant part: "[s]chool boards may

require a special medical examination for any school employe at any time."  24 P.S. § 14-

1418(c).  We do not believe the above provision of the School Code gave Highlands an absolute

right to require the plaintiff to undergo an independent medical exam.  First of all, § 14-1418(c)

of the School Code is silent as to the scope of medical examinations and disability-related

inquiries.  Furthermore, to the extent the School Code conflicts with an individual's rights which

are protected under the ADA, the School Code would be preempted.  See, English v. General

Electric Co., 496 U.S. 72, 78-79 (1990).

Highlands cites Murray v. Pittsburgh Board of Educ., 759 F.Supp. 1178, 1183

(W.D.Pa. 1991), for the notion that a school board may legitimately seek medical and psychiatric

information from its teachers, as public policy favors the disclosure to school administrators of

a teacher's actual or potential medical problems.  In Murray, however, this Court recognized that

several factors should be considered in deciding whether an intrusion into an individual's privacy

is justified, including "the type of record requested, the information it does or might contain, the

potential for harm in any subsequent nonconsensual disclosure... the adequacy of safeguards to

prevent unauthorized disclosure, [and] the degree of need for access".  Id. at 1181, citing, F.O.P.,

14

<u>Lodge 5 v. City of Philadelphia</u>, 812 F.2d 105, 110 (3d Cir. 1987), and <u>Westinghouse Electric</u> <u>Corp</u>., 638 F.2d 570, 578 (3d Cir. 1980).  In this case, the question of whether Highlands complied with the dictates of 42 U.S.C. § 12112(d)(4)(A) is a matter for the trier of fact.

        Therefore, it is recommended that the defendant's motion for summary judgment (Document No. 23) be granted as to Count I of the complaint and denied as to Count II.

        Within thirteen (13) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

        Respectfully submitted,

        <u>      s/ ROBERT C. MITCHELL</u>
        United States Magistrate Judge

Dated: August 20, 2007